United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RICK CAVIGLIA, et al.,

Plaintiffs,

v.

ROWE INTERNATIONAL CORPORATION, et al.,

Defendants.

Case No. 14-cv-04834-JCS

**ORDER REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 46, 55

## I. INTRODUCTION

Plaintiffs Rick Caviglia, Clayton Chrisman, Ricci Romagnesi, and Tom Pigoski bring this action alleging that Defendants Rowe International Corporation and AMI Entertainment Network, LLC (collectively, "AMI") breached a contract to pay Plaintiffs royalties on jukeboxes sold by AMI that share certain features with a line of jukeboxes that Plaintiffs designed and marketed before AMI bought the assets of Plaintiffs' now-defunct company in 2008. The dispute turns primarily on the interpretation of a contract provision setting the scope of AMI's royalty obligations. Plaintiffs and AMI each move for summary judgment, each asserting that the contract is either unambiguous on its face or amenable to only one interpretation in light of the evidence in the record. The Court held a hearing on February 19, 2016. AMI's Motion is GRANTED in part as to Plaintiffs' claims that AMI failed to adequately market Plaintiffs' products, a claim that Plaintiffs now concede is time barred. As discussed below, however, the meaning of the contract's royalties provision is ambiguous, and a jury, weighing the extrinsic evidence, could find for either party on that issue. Both motions for summary judgment are therefore DENIED as to Plaintiffs' claims regarding royalties.[1]

[1] All parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

## II. BACKGROUND

### A. Overview

This case arises from a dispute over whether Plaintiffs are entitled to royalties under their contract with AMI, which provides for royalties for each "Vision Jukebox" sold by AMI. Agreement § 2.2.[2] The key question is whether AMI's line of NGX jukeboxes constitute "Vision Jukeboxes" within the meaning of the Agreement. That term is defined as follows:

> [T]he term "Vision Jukebox" shall mean each Jukebox sold by [AMI] that[:]
>
> (i) is a part of the Vision product family of jukeboxes, which is comprised of the Vision, InnoVision, and EconoVision jukeboxes; or
>
> (ii) incorporates the Vision modular cabinet and is compatible with the Vision "skins" concept embodied in the product designs included in the Purchased Assets.

*Id.* § 2.2(d) (line breaks added). Plaintiffs argue that the NGX product line falls within the meaning of subsection 2.2(d)(ii), as incorporating "the Vision modular cabinet" and compatible with "the Vision 'skins' concept." Those terms are not defined in the Agreement.

Both parties assert that the relevant portion of the Agreement is unambiguous. As discussed in the remainder of the Order, both parties are mistaken.

### B. Factual Background

#### 1. View and the Vision Jukebox

Plaintiffs are four individuals who formed a company, non-party View Interactive Entertainment Worldwide ("View"), to develop and market kits to convert older CD-based jukeboxes to modern digital music jukeboxes. Caviglia Decl. (dkt. 58) ¶ 2. Later, View developed its own digital jukebox called the Vision. *Id.* ¶¶ 9–10. Two of the Vision's selling points were a modular internal design and the ability to customize its external appearance through

[2] The Agreement appears in the record as Exhibit E to the declaration of Rick Caviglia, Exhibit 7 to AMI's compendium of evidence (dkt. 62). AMI filed versions of its compendium with both its Motion and its Opposition. Because the two compendia are identical except for the addition of new exhibits to the latter version, all citations to the compendium refer to the version filed with AMI's Opposition.

United States District Court
Northern District of California

easily replaceable "skins." *See id.* ¶ 11.

The modular design addressed a number of concerns of jukebox operators,[3] including that: (1) operators were forced to purchase jukeboxes with features they did not need; (2) jukeboxes were heavy and difficult to install; and (3) servicing damaged or defective components was difficult, sometimes requiring jukeboxes to be removed from their locations for off-site maintenance and repairs. *See id.* ¶¶ 6–8. The Vision's modular design allowed components such as amplifiers, payment interfaces, and computers to be quickly removed and replaced, thus allowing an operator to customize the jukebox for that operators' needs, allowing a single person to install the jukebox (because components could be removed during installation and reattached after the jukebox was mounted to the wall), and allowing for easier maintenance (because defective components could be removed and replaced on site). *See id.* ¶ 11; Glapinski Report at 2–3.

The Vision's "skins" allowed an operator to remove the outer covering of the jukebox by unscrewing several nuts, and then install a new covering either to change the jukebox's aesthetic or to replace a worn or damaged "skin." Caviglia Decl. ¶ 11; Glapinski Report at 4. An article describing the Vision in *RePlay Magazine*, a trade publication, described the "skin" feature as follows:

> "The niftiest feature is the skin, which can be totally changed around," noted Caviglia. "It can be a wooden front, a molded plastic front, a modern look, a branded McDonald's juke, etc. You can literally have face fronts sitting in your shop and change them on location as you need to with a nutdriver."
>
> This will allow operators to keep location owners looking for new jukeboxes happy while keeping reinvestment costs down.

*Id.* Ex. C. Later, when explaining the features and components of the Vision to AMI after the parties reached the Agreement at issue in this case, Caviglia wrote that "[n]ew skins allow for 'new jukebox model' released more often without the cost to develop an entire new unit," and noted that skins "[c]an be made to fit location decor," including various eras, styles, and brands.

[3] In the jukebox industry, operators contract with bars and other establishments for the operators to install and maintain jukeboxes on the premises of those establishments, with the operators and the establishments sharing revenue from the jukeboxes. Caviglia Decl. ¶ 4.

Caviglia Decl. Ex. G at DEF007377.

Plaintiffs believed the modular design and "skins" concept to be unique among then-existing jukeboxes. AMI Compendium (dkt. 62) Ex. 17 (Romagnesi Dep.) 53:14–20; *id.* Ex. 19 (Caviglia Dep.) 44:21–45:10, 64:17–65:4; *id.* Ex. 20 (Chrisman Dep.) 87:22–88:14; *see also* Caviglia Decl. ¶ 14.[4] There is evidence, however, that some preexisting jukeboxes (including some produced by AMI) incorporated similar features. *See, e.g.*, Jarema Opp'n Decl. (dkt. 61) ¶¶ 27–28; AMI Compendium Ex. 27 at COE pp. 476–77[5] (report by AMI's expert witness John Schultz describing other jukeboxes with similar features); *id.* Ex. 31 (documentation for AMI's NiteStar jukebox describing modular components).

View introduced the Vision at a trade show in 2006. Caviglia Decl. ¶ 10. Digital jukeboxes require software in order to function, and View—which did not have the capability to develop its own software—originally partnered with non-party Ecast to provide software for the Vision. *See id.* ¶ 15; AMI Compendium Ex. 18 (Pigowski Dep.) 83:11–12. "At some time in 2007, changes made by Ecast required View to search for another software provider to drive [the Vision jukebox]." Caviglia Decl. ¶ 15. Specifically, Ecast "kept threatening to pull the software from [View's Vision jukebox] because [Ecast] wanted to go into their own manufacturing business." AMI Compendium Ex. 18 (Pigowski Dep.) 83:12–14.

View manufactured and sold only 100 to 150 Vision jukeboxes. *Id.* 82:19−20. At least

[4] Caviglia states in his deposition that "[a]t the time Plaintiffs introduced the Vision Jukebox, all of AMI/Rowe's jukeboxes utilized the traditional non-modular jukebox design. These jukeboxes did not include any of the attributes of Plaintiffs' Vision Jukebox, i.e., no easily changeable cosmetic 'skins,' . . . and no modularity that would enable easy service access and/or upgradeable components." Caviglia Decl. ¶ 14. AMI objects to this paragraph for lack of foundation and personal knowledge, and as improper opinion testimony. AMI Opp'n at 24−25. The Court agrees that Caviglia has not established a foundation for comprehensive knowledge of AMI's product line, but nevertheless finds the paragraph admissible to show that Caviglia was not aware of products with those features. Given that Caviglia had been a jukebox operator for several years at that time, his lack of knowledge of such products could be relevant to (although likely not dispositive of) the extent to which replaceable skins and modular components had been adopted in the industry.

[5] AMI's compendia of evidence include page numbers that run consecutively across all exhibits. Where an exhibit either includes multiple documents with separate page numbering schemes (as here) or does not have internal page numbers, this Order cites the page numbers that AMI added for the compendia, designated herein as "COE pp." In contrast, where a citation to internal page numbers would be unambiguous, as with an exhibit that consists solely of a deposition transcript, this Order uses the internal page number.

one Plaintiff, Tom Pigowski, did not consider the Vision "commercially successful" because Plaintiffs "didn't sell [very] many," *id.* 82:14−16, although Plaintiff Caviglia states that View gained "significant interest for the Vision Jukebox in the market, and quickly sold its first 100 production units" before Ecast ceased partnering with View to provide software for the Vision, Caviglia Opp'n Decl. (dkt. 66) ¶ 6. By October 25, 2007, View had "closed [its] doors" and stopped selling jukeboxes. AMI Compendium Ex. 19 (Caviglia Dep.) 154:8−25 & Ex. 4 thereto.

Plaintiffs developed concepts for two additional jukeboxes that they did not bring to market before View shut down: the EconoVision (similar to the Vision but "without a skin"), and the InnoVision ("a partially empty Vision that could be completed by populating the cabinet [with components] from an older CD jukebox"). Caviglia Decl. ¶ 17.

**2. Sale to AMI**

Plaintiffs' perception that Ecast was not a reliable software supplier for the Vision motivated them to seek to sell their business. AMI Compendium Ex. 18 (Pigowski Dep.) 83:5–22. Plaintiff Pigowski had a prior relationship with AMI, so Plaintiffs viewed AMI as the primary potential buyer, and Pigowski made the initial contact with AMI. *See id.* 85:7–11; Caviglia Decl. ¶ 16.[6] Plaintiffs also reached out to AMI's competitor TouchTunes, but "the primary communication was with AMI." Caviglia Decl. ¶ 16.

AMI decided to purchase View's assets, including the Vision, in part as an effort to capture new customers. AMI Compendium Ex. 25 (Maas Dep.) 97:9−100:10. Certain Plaintiffs were resistant to the terms that AMI offered. *See* AMI Compendium Ex. 18 at COE pp. 147−150 (email thread among Plaintiffs, included as Exhibit 4 to the deposition of Thomas Pigowski). The parties nevertheless reached an agreement and executed a non-binding letter of intent on November 30, 2007 for AMI to "buy all of View's assets, including inventory, intellectual property, goodwill, and drawings and prototypes" for $250,000, plus a royalty of $400 per unit for the first 1,500 Vision jukeboxes sold by AMI and $250 per unit thereafter. Caviglia Decl. ¶ 18 & Ex. D.

[6] According to Caviglia, AMI had also previously approached Plaintiffs about partnering with or buying out View. AMI Compendium Ex. 19 (Caviglia Dep.) 101:8−12.

Although Plaintiffs were represented by a lawyer during the negotiations, some discussions took place directly between Plaintiff Clayton Chrisman and AMI's representative Brandon Bezzant. *See* Chrisman Decl. (dkt. 56) ¶¶ 2−4 & Ex. A. Chrisman states in his declaration that "one of the primary concerns we articulated to representatives from AMI/Rowe was that we did not believe royalty payments be limited [sic] to just the Vision Jukebox (which included the Vision, the InnoVision, or the EconoVision[)]," but rather that royalties should apply to "any products that were derivative of the Vision Jukebox." *Id.* ¶ 3. Plaintiffs feared that AMI "would try to use the core concepts of the Vision Jukebox on another jukebox that they called something different." *Id.* Chrisman states that he "personally articulated" this concern to AMI representatives, including "both verbally and in an email for Mr. Bezzant." *Id.* ¶¶ 3−4. An email that Chrisman sent to Bezzant in February of 2008 in response to a contract proposal stated that the proposal's purported "impli[cation] that that if Rowe removed the 'View' brand name, they wouldn't have to pay us a royalty . . . needs to be fixed." *Id.* Ex. A. That email also refers twice to "Vision-derivative" products. *Id.* In an effort to address the issue, Plaintiffs proposed a revision to the contract that included the word "concept" in the definition of the term "Vision Jukebox." *See id.* ¶ 5 & Ex. B. AMI accepted that change. *Id.* ¶ 5; *see also* Agreement § 2.2(d)(ii).

The parties signed the final Agreement in March of 2008. Caviglia Decl. ¶ 19 & Ex. E. As set forth above, the Agreement provides that Plaintiffs shall receive royalties on AMI's sales of "Vision Jukeboxes," defined as a jukebox that either "(i) is a part of the Vision product family of jukeboxes, which is comprised of the Vision, InnoVision, and EconoVision jukeboxes; *or* (ii) incorporates the Vision modular cabinet *and* is compatible with the Vision 'skins' concept embodied in the product designs included in the Purchased Assets." Agreement § 2.2(d) (emphasis added).

Bezzant testified at his deposition that he understood the term "Vision modular cabinet" to mean "the cabinet of the dimensions, materials, [and] specification . . . used in the Vision." AMI Compendium Ex. 26 (Bezzant Dep.) 67:1−7. He did not recall any discussion of whether the royalty provision would apply to a cabinet with different dimensions, but did recall Plaintiffs'

concern that AMI might sell a rebranded Vision jukebox or a jukebox with the same cabinet but different internal components in an effort to avoid paying royalties. *Id.* 67:14–23. According to Bezzant, the "core of their concept was that that one cabinet could be used interchangeably across models and that the operator's collection of skins, inventory of skins, could be used across all of the jukeboxes in his fleet so that he could easily swap out the appearance without having to actually move the jukebox." *Id.* 67:23–68: 4. Bezzant testified that the addition of the word "concept" to the provision relating to skins was intended to preclude AMI from avoiding royalties if it designed new skins (with new colors or patterns) compatible with the Vision jukebox, a concern that Clayton purportedly articulated to Bezzant. *Id.* 63:1–19.

**3. AMI's Marketing and Discontinuation of the Vision**

After purchasing View's assets and beginning to market the Vision, AMI received feedback that operators did not want to buy a jukebox that was incompatible with the components used in other AMI jukeboxes. AMI Compendium Ex. 22 (Margold Dep.) 51:9–52:20. AMI developed a new version of the Vision designed to incorporate standard AMI components, which it called the Vision 2. Caviglia Decl. ¶ 22; Maas Opp'n Decl. (dkt. 61-3) ¶ 9. AMI continued to advertise the Vision 2's modular components (which allowed for simplified maintenance and upgrades) and customizable skins. Caviglia Decl. ¶ 22 & Ex. H (Vision 2 promotional flyer). The Vision 2 used a slightly different cabinet than the original Vision. *Id.* ¶ 22 (noting that the Vision 2 used a larger screen, which "naturally changed the dimensions of the cabinet); AMI Opp'n (dkt. 61) at 12 (describing the Vision 2 as having "slightly larger dimensions").

AMI sold few if any Vision jukeboxes at the full retail price. AMI Compendium Ex. 22 (Margold Dep.) 90:13–25. In total, AMI produced 150 Vision or Vision 2 jukeboxes, of which it shipped approximately 147—many for free "as part of various promotions." Maas Opp'n Decl. ¶ 15. AMI paid Plaintiffs royalties on the Vision-branded jukeboxes that AMI sold, including the Vision 2. *See* Caviglia Decl. ¶ 24. AMI ultimately concluded that "it did not make commercial sense to continue marketing the Vision products" and discontinued them. Maas Opp'n Decl. ¶ 14. AMI's last sale of a Vision jukebox occurred in March of 2010. *Id.* ¶ 15; *see also* AMI Compendium Ex. 14 (spreadsheet of Vision sales).

**4. The NGX Line of Jukeboxes**

Around the end of 2009, AMI began developing the NGX line of jukeboxes, seeking a lower-cost product than its existing jukeboxes. AMI Compendium Ex. 21 (Jarema Dep.) 62:17–24, 74:4–13. According to Jarema, the NGX was inspired by and derived from a game system that AMI was developing called PhotoHunt XL. *Id.* 62:25–63:20. By rotating the PhotoHunt XL device's screen from landscape to portrait orientation, and adding an amplifier and pre-amp to the existing components such as the core computer, AMI would "basically have a jukebox." *Id.* 63:13–20. The NGX was introduced in February or March of 2011. Jarema Opp'n Decl. ¶ 13; Caviglia Decl. ¶ 25.

Like the Vision, the NGX is based around a cabinet containing modular components and its appearance can be customized using easily replaceable skins. *See generally* Glapinski Report. The NGX differs from the Vision in other ways, including that the cabinet is a different size and shape, not all components are contained in the same cabinet (there is a separate, smaller cabinet for the payment module), the screen is larger, and its skins are optional rather than necessary, include lights, and can alter the functionality of the jukebox. *See* AMI Compendium Ex. 27 at COE p. 478 (report of John Schultz). Other than the fact that both are at least vaguely rectangular, mount on a wall, and feature touch screens, the two jukeboxes do not look particularly similar—mostly owing to the different sizes and aspect ratios of their screens, since the remainder of each jukebox's appearance is highly dependent on the choice of customizable skins. *See* AMI Compendium Ex. 30 at 587 (presentation slide featuring photographs of both jukeboxes side by side).

In an April 2011 article in the *Vending Times*, a trade publication, AMI touted the modular design of the NGX, which the article characterized as "a distinct departure from AMI's Rowe jukeboxes." Caviglia Decl. Ex. K at 69. The article quotes AMI's creative director AJ Russo as stating: "For the first time, you open the box and you'll see a very clean and simple arrangement." *Id.* Also like the Vision, the NGX could be installed by a single person, *id.* at 68, however that capability derived from the ability to remove the cabinet door to reduce weight rather than removing modular components as with the Vision. Jarema Opp'n Decl. ¶ 25

AMI also marketed the NGX based on the flexibility afforded by offering different "skins." The 2011 *Vending Times* article quotes Steve Jarema, AMI's director of hardware engineering, as follows:

> One of the things first happens with operators is they get demands by location owners to freshen the look of the juke, so once a year, they have to lug a new box in. . . . With NGX skins, all they have to do is that the face off the juke and go from one look to a completely different look.

Caviglia Decl. Ex. K at 68–69. Another trade publication, *Play Meter*, published a story featuring the NGX and quoting AMI's president and CEO Mike Maas as follows:

> If you are an operator and you are competing, you have to win the location and keep the location. We wanted to give the operators the tools to do both. We thought, "Wouldn't it be nice if you offered the location a choice: old fashioned: modern, or a look that fits the decor?["] Skins do that; they are a selling tool for operators. . . . Locations want something new and fresh, but changes are complicated and expensive.

*Id.* Ex. M at 60.

Each "skin" for the NGX consisted essentially of a decorative frame that fit around the perimeter of the jukebox. *See* AMI Compendium Ex. 21 (Jarema Dep.) 76:21−77:25. Most of the NGX skins incorporated lights, although AMI also at one point offered custom wooden skins that did not have lights. *Id.* 80:4−13. As with the Vision, different skins have the potential to significantly alter the look and feel of the NGX. *See* AMI Compendium Ex. 30 at COE p. 583 (presentation slide featuring photographs of different NGX skins). Certain NGX skins also had the capability to interface with the jukebox and change the colors and content of the jukebox's digital display. Jarema Opp'n Decl. ¶ 16. Purportedly unlike the Vision,[7] the NGX is fully functional without a skin, and 30% of AMI's NGX sales have not included a skin. *Id.* ¶¶ 17, 23−24. NGX skins can be installed or removed without tools, *id.* ¶ 24, although locking the skin or removing a locked skin requires a tool, Glapinki Report at 4.

AMI developed three additional variations of the NGX: the NGX Mini, the NGX FacePlace, and the NGX Grand. The NGX Mini has a smaller screen, and the parties appear to

[7] Whether the Vision can operate without a skin is disputed. *See* Caviglia Opp'n Decl. ¶ 7.

dispute whether it uses skins at all. *Compare* Jarema Opp'n Decl. ¶ 18, *with* Glapinski Report at 4. The NGX FacePlace is a standard NGX that incorporates a printer and a camera built into the skin to allow for photo booth capabilities. Jarema Opp'n Decl. ¶ 19. The NGX Grand is a standard NGX housed in a floor stand that also includes speakers to allow for portable, plug-in operation. *Id.* From 2011 through January of 2015, AMI sold 10,373 units total across its four NGX product lines, the overwhelming majority of which were either the original NGX or the NGX Mini. Griffin Opp'n Decl. (dkt. 67) ¶ 4 & Ex. C.

## III. ANALYSIS

### A. Legal Standard for Summary Judgment

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id.* "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986). On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587 (1986).

Here, both parties have moved for summary judgment or adjudication as to at least certain issues. In considering AMI's Motion the Court draws all reasonable inferences in favor of Plaintiffs, and in considering Plaintiffs' Motion the Court draws all reasonable inferences in favor of AMI.

### B. Contract Interpretation Under California Law

California law calls for fairly liberal use of extrinsic evidence to determine the meaning of a contract: "Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the

language of the contract is yet reasonably susceptible." *Morey v. Vannucci*, 64 Cal. App. 4th 904, 912 (1998) (citing *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 40 & n.8 (1968); *Pac. Gas & Elec. Co. v. Zuckerman*, 189 Cal. App. 3d 1113 (1987)). "If the court decides, after considering this evidence, that the language of a contract, in the light of all the circumstances, is 'fairly susceptible of either one of the two interpretations contended for . . . ,' extrinsic evidence relevant to prove either of such meanings is admissible." *G.W. Thomas Drayage*, 69 Cal. 2d at 40 (quoting *Balfour v. Fresno Canal & Irrigation Co.*, 109 Cal. 221, 225, (1895)) (citations omitted). "Indeed, it is reversible error for a trial court to refuse to consider such extrinsic evidence on the basis of the trial court's own conclusion that the language of the contract appears to be clear and unambiguous on its face." *Morey*, 64 Cal. App. 4th at 912.

Under California law, conflicting extrinsic evidence as to a contract's meaning may require resolution by a jury, and thus be inappropriate for resolution on a motion for summary judgment. *See id.* at 912–13. "As trier of fact, it is the jury's responsibility to resolve any conflict in the extrinsic evidence properly admitted to interpret the language of a contract." *Id.* at 913 (citing *Med. Operations Mgmt., Inc. v. Nat'l Health Labs., Inc.*, 176 Cal. App. 3d 886, 891–92 & n.4 1986)).

**C. Plaintiff's Claims Regarding Royalties Present Genuine Issues of Material Fact**

Plaintiffs' claims primarily turn on whether the NGX is a "Vision Jukebox" within the meaning of the Agreement's royalty provision. Plaintiffs do not assert that the NGX is "part of the Vision product family of jukeboxes," but instead focus their argument on subsection (ii) of the "Vision Jukebox" definition, asserting that the NGX "[1] incorporates the Vision modular cabinet and [2] is compatible with the Vision 'skins' concept." *See* Agreement § 2.2(d); Pls.' Mot. at 16–22; Pls.' Opp'n at 16–24; Pls.' Reply at 2–9.

This Order addresses each of the two requirements of subsection (ii) in turn. For Plaintiffs to be entitled to summary judgment in their favor, they most show that they are entitled to summary judgment on *both* prongs—i.e., drawing all reasonable inferences in AMI's favor, the evidence nevertheless establishes *both* that the NGX incorporates the Vision modular cabinet *and* that it is compatible with the Vision "skins" concept. For AMI to obtain summary judgment, it

must show only that it is entitled to summary judgment on *either* prong—i.e., drawing all reasonable inferences in Plaintiffs' favor, there is *either* no evidence that the NGX incorporates the Vision modular cabinet concept *or* no evidence that it is compatible with the Vision "skins" concept. For the reasons stated below, the Court holds that there are genuine issues of material fact as to both requirements, and summary judgment is not warranted for either party.

**1. Whether the NGX "Incorporates the Vision Modular Cabinet"**

The term "Vision modular cabinet" is integral to the Agreement's definition of a "Vision Jukebox," but is not itself defined. While each party claims that its favored definition of the "Vision modular cabinet" is unambiguous, they differ sharply in what the term means. *See* Pls.' Mot. at 16 ("It cannot seriously be disputed that the NGX incorporates the Vision modular cabinet. The 'modular cabinet' is not a reference to an actual, physical cabinet [but rather] to the fact that all jukebox components *within* the cabinet are modular in nature."); AMI Reply at 5 ("[R]equiring the incorporation of the 'Vision modular cabinet' means, by any reasonable interpretation, that a different cabinet with modular components . . . would not suffice.").[8]

a. Plaintiffs Are Not Entitled to Summary Judgment on This Issue

AMI's proposed definition—that the "Vision modular cabinet" refers to the specifications of the physical cabinet used in the Vision—is certainly plausible. If that is the meaning of the contract, there is no dispute that the NGX uses a physically different cabinet from the Vision, and thus would not fall within the royalty provision.

As a matter of plain language, it is not a stretch to interpret the word "cabinet" as referring to a physical cabinet. And looking to extrinsic evidence, Brandon Bezzant testified that during negotiations, the reason Plaintiffs sought to include subsection 2.2(d)(ii) in the Agreement was to prevent AMI from avoiding royalties by introducing a jukebox with a new name and perhaps new components, but the same physical cabinet and skins as the Vision. AMI Compendium Ex. 26

[8] AMI's counsel argued at the hearing that because Plaintiffs "conceded" that the contract was unambiguous, there is no factual dispute as to its meaning, and extrinsic evidence need not be considered. That each party is convinced that its respective interpretation is correct is not a concession. Rather than demonstrating that the contract is unambiguous, the parties' divergent positions tend to suggest the opposite.

(Bezzant Dep.) 65:7–67:7. The email that Chrisman sent to Bezzant during negotiations is consistent with Bezzant's testimony regarding the nature of Plaintiffs' concern. *See* Chrisman Decl. Ex. A ("Also, the way it's currently written implies that if Rowe removed the 'View' brand name, they wouldn't have to pay us a royalty . . . ."). If a jury credits Bezzant's testimony and interprets the email as a complete statement of Plaintiffs' concern, the jury could conclude that the "Vision modular cabinet" referred to the physical cabinet used in the Vision.

Plaintiffs' arguments to the contrary are not sufficient to warrant summary judgment in their favor. Plaintiffs contend that AMI acknowledged that the "modular cabinet" provision was broader than the specific physical cabinet by paying royalties on sales of the Vision 2, which used a slightly different physical cabinet. *See* Pls.' Mot. at 17–18; Pls.' Reply at 5. AMI contends that it paid royalties for the Vision 2 because it believed that model fell within § 2.2(d)(i) as a "part of the Vision product family of jukeboxes," not within § 2.2(d)(ii) as incorporating the Vision modular cabinet. AMI Opp'n at 21. Although Plaintiffs are correct that the Vision 2 was not one of the three defined members of the product family, Pls.' Reply at 5, it is plausible that AMI would have determined that the spirit of § 2.2(d)(i) incorporated a jukebox that bore both the "Vision" name and a strong resemblance to the original Vision. As neither party cites any evidence in the record actually addressing why AMI paid royalties for the Vision 2, the Court cannot say that such payments indisputably evince an understanding by AMI that the "modular cabinet" provision was broader than the physical cabinet used in the Vision.

Plaintiffs also argue that the fact that the modular design was an important selling point of the Vision supports their interpretation, that the parties intended the term "Vision modular cabinet" to refer to the principle of housing modular components in a single main cabinet. While the Court concludes that such an interpretation is also possible, it does not negate the possibility of a jury crediting AMI's alternative view.

Moreover, even if a jury accepts a definition based on the organization of the cabinet's contents rather than its physical shape and size, there is room for further interpretation as to whether such a definition encompasses the NGX. If the term was intended to cover a design in which *most* of the components are modular and housed in an easily accessible cabinet, the NGX

might meet that definition. But if (as one possibility) *all* of the components must be modular and housed in a single cabinet, the NGX would not qualify because its payment module is located in a separate cabinet. Once again, the ultimate determination will depend on a jury's view of the parties' intent based on the record as a whole. Because there is a genuine issue of fact as to whether the parties intended the term "Vision modular cabinet" to include a jukebox design like the NGX, Plaintiffs' Motion for Summary Judgment must be DENIED.

b. AMI Is Also Not Entitled to Summary Judgment on This Issue

AMI contends that the physical cabinet is the only permissible interpretation of the "Vision modular cabinet" provision. The Court disagrees. The use of the word "modular" creates the possibility that the phrase refers to the cabinet's layout rather than the physical cabinet itself, particular if a jury credits Caviglia's testimony that "there is nothing about the physical cabinet itself that is modular. It is the internal components of the cabinet that are modular, and that carry with them all the benefits of modularity." Caviglia Opp'n Decl. ¶ 5.[9] If the jury credits Chrisman's testimony that he informed AMI of Plaintiffs' concern that royalties should attach to "any products that were derivative of the Vision Jukebox," Chrisman Decl. ¶ 3, that could also support an inference that AMI knew that Plaintiffs believed the "Vision modular cabinet" provision in the final contract encompassed the design concept rather than merely the specifications of the physical cabinet. *See* Cal. Civ. Code § 1649 ("If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.").

In support of its view that the provision can only refer to the physical cabinet, AMI relies in part on Caviglia's deposition testimony, which AMI construes as an admission on this point:

> At deposition, Caviglia unequivocally differentiated between a "Vision modular cabinet" and "Vision modular components" stating that the "Vision modular components" are what the cabinet is comprised of, and the cabinet is what "houses the components."

[9] AMI objects to this paragraph of Caviglia's declaration. The Court agrees that portions of the paragraph not quoted here constitute an improper legal conclusion, but finds Caviglia's experience developing the Vision to be a sufficient foundation for testimony as to which portions of it were modular.

AMI Reply at 7 (citing AMI Compendium Ex. 19 (Caviglia Dep.) 125:25−126:7). But Caviglia's testimony that "[t]he Vision modular components are what the cabinet is comprised of," Compendium Ex. 19 (Caviglia Dep.) 125:25−126:7, is consistent with Plaintiffs' position that the term "Vision modular cabinet" means more than a physical cabinet (which would not be "comprised of" components, but rather of the plastic or metal from which it was made), and instead encompasses the concept of housing modular components primarily in a single cabinet.

AMI also argues, essentially, that it is not plausible that the parties intended the broader meaning that Plaintiffs put forward now, because if the term means "any modular cabinet," then "in this era, all jukeboxes fit that requirement." AMI Mot. at 22. Even if that is so, it is not clear that the modular concept embodied by the Vision and NGX jukeboxes was as common when the parties entered the Agreement. Although at least one preexisting Rowe jukebox was advertised as having "[m]odular component construction for easy removal and replacement," AMI Compendium Ex. 31 (NiteStar product description), there is evidence to suggest that the "modular cabinet" concept had not been widely adopted. Caviglia's declaration indicates that despite his experience in the industry, he was not aware of other jukeboxes using the modular approach of the Vision—instead, repairs often required moving an entire jukebox off site rather than merely replacing a component. Caviglia Decl. ¶¶ 6−9. Industry press coverage of both the Vision and the NGX presented their simple modular cabinet configurations as innovative. *Id.* Ex. C at 132−33 (*RePlay Magazine* article describing the modular approach of the Vision); *id.* Ex. K at 69 (*Vending Times* article characterizing the NGX as "a distinct departure from AMI's Rowe jukeboxes" and quoting an AMI employee as stating that "*[f]or the first time*, you open the box and you'll see a very clean and simple arrangement." (emphasis added)).

Further, even if the "Vision modular cabinet" provision were so broad as to encompass many products on the market, the Agreement did not require AMI to pay royalties on every jukebox encompassing that feature, but instead only on jukeboxes that *both* encompassed the Vision modular cabinet *and* were compatible with the Vision "skins" concept addressed below. Whether a jury would believe that AMI intended to pay Plaintiffs royalties on every jukebox incorporating a modular cabinet design similar to the Vision is not the issue, because the cabinet

provision was not the only criteria for royalties.

Finally, Plaintiffs offer a report by their expert witness Edward Glapinski that includes his conclusion that "both the NGX and NGX [M]ini incorporate the Vision modular cabinet," based on considerations including similarities in the standard components used, the options for customization, and the ease of service. Glapinski Report at 2−3. AMI does not object to Glapinski's report and has not moved to exclude it under the standard for expert testimony set by the Federal Rules of Civil Procedure and described in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). It is not the Court's role on a motion for summary judgment to assess the weight or credibility that Glapinski's opinions deserve. If Glapinski testifies to the same conclusions at trial, a jury crediting that testimony could conclude that the NGX and the NGX Mini "incorporate the Vision modular cabinet."

A party's case "need not be a slam dunk" to survive a motion for summary judgment. *Dawson v. New Life Cmty. Servs.*, No. 5:13-CV-00881-PSG, 2014 WL 2508533, at *4 (N.D. Cal. June 3, 2014). Crediting Plaintiffs' evidence and drawing reasonable inferences in their favor, a jury could find that the NGX's modular cabinet design falls within the "Vision modular cabinet" provision of the Agreement even though the cabinets are not identical. AMI's Motion for Summary Judgment is therefore DENIED as to this issue.

**2. Whether the NGX "Is Compatible with the Vision 'Skins' Concept"**

The second part of the royalties test at issue, whether a jukebox "is compatible with the Vision 'skins' concept embodied in the product designs," is plainly ambiguous. *See* Agreement § 2.2(d)(ii). Any number of concepts are embodied in the Vision's skins, ranging from the concept of adding color to a jukebox to the concept of covering internal electronics, and the Agreement itself provides no guidance as to which concept it refers. Turning to extrinsic evidence regarding the nature of the Vision and its selling points, it is fairly clear that the concept at issue relates to skins that an operator can easily replace on site to customize or refurbish the appearance of a jukebox. But whether that is enough (which would encompass the NGX), or whether the parties intended a narrower concept such as a skin that bolts onto a jukebox using nuts, a skin that fits over fixed lighting features on a jukebox, or even a skin that attaches the Vision's particular

cabinet (none of which would include the NGX) will require a jury to parse the parties' intent based on conflicting and countervailing extrinsic evidence. Such evidence likely includes, but is not limited to, the nature of the concerns that Plaintiffs expressed to AMI when Plaintiffs proposed adding the word "concept"—whether, as Chrisman states, he told AMI's representatives that Plaintiffs intended to ensure that AMI would pay royalties for products derived from the Vision, or whether, as Brezzant testified, Plaintiffs were merely concerned with the risk that AMI would rebrand a jukebox essentially identical to the Vision. The Court cannot resolve those issues on a motion for summary judgment by either party.

**D. Plaintiffs' Claims Regarding AMI's Marketing Efforts Is Time Barred**

Both of Plaintiffs' claims—for breach of contract and breach of the covenant of good faith and fair dealing—include allegations regarding AMI's alleged failure to market the Vision jukebox as required by the Agreement. *See* FAC ¶¶ 37, 42. Under the Agreement, AMI's obligation to market the Vision terminated on the later of March 10, 2010 (two years after the closing date) or the end of any calendar quarter in which AMI sold fewer than fifty Vision jukeboxes. Agreement § 2.2(g). The undisputed evidence indicates that AMI never sold more than fifty Visions in a quarter during the initial two year period, Maas Opp'n Decl. ¶ 15, so the marketing commitment terminated on March 10, 2010.[10]

The statute of limitations for breach of a written contract in California is four years. Cal. Civ. Proc. Code § 337. Because any breach of AMI's marketing obligation must have occurred no later than when the obligation expired on March 10, 2010, the deadline to bring a claim for breach of that obligation was, at the latest, March 10, 2014. Plaintiffs did not file this action until October 30, 2014. *See* Compl. (dkt. 1). In their Opposition to AMI's Motion, Plaintiffs make clear that they "do not oppose partial summary judgment as to their claim for failure to use reasonable efforts to market the Vision Jukebox on the sole ground that such claim is time-

[10] Even if the NGX is ultimately found to be a "Vision Jukebox" within the meaning of the Agreement, the Agreement includes no provision to renew AMI's marketing obligation if AMI resumes selling Vision Jukeboxes after that obligation expires. *See* Agreement § 2.2(g); *cf. id.* § 2.2(j) (making clear that AMI's obligation to pay royalties would continue under such circumstances, but not addressing AMI's marketing obligation).

barred." Pls.' Opp'n at 13. Defendants' Motion is therefore GRANTED as to that issue.

**IV. CONCLUSION**

For the reasons stated above, both parties' Motions for Summary Judgment are DENIED, except that AMI's Motion is GRANTED IN PART as to Plaintiffs' claims regarding AMI's marketing efforts.

**IT IS SO ORDERED.**

Dated: February 26, 2016

JOSEPH C. SPERO
Chief Magistrate Judge